[No. 1790.]

## Edward Bennett *v.* The State.

Theft — Evidence — Voluntary Return of Stolen Property — Fact Case.— See the statement of the case for evidence *held* sufficient to show a voluntary return of the stolen property within a reasonable time and before the institution of a prosecution for the theft; wherefore the verdict of guilty assessing the penalty at confinement in the penitentiary is *held* to be contrary both to the evidence and to the charge of the court upon the subject.

Appeal from the District Court of Falls. Tried below before the Hon. B. W. Rimes.

The indictment charged the appellant with the theft of a watch of the value of $100, the property of W. A. J. Nicholson, in Falls county, Texas, on the 21st day of May, 1884. A verdict of conviction assessed the punishment at confinement in the penitentiary for a term of two years.

Captain W. A. J. Nicholson was the first witness for the State. He testified that he was the proprietor of a saloon in Marlin, Falls county, Texas. Some ten days or two weeks prior to the 21st day of May, 1884, witness went to his business very early in the morning, and found the defendant sitting in front of his saloon. Witness engaged the defendant in conversation, and soon found out that he was a stranger in the town and was destitute of money. Thereupon the witness took the defendant into his saloon and kept him there for a week or two, doing small chores. During this week or two, the witness had meals brought to the defendant at the saloon by other boys in his, the witness's, employ. A very heavy and protracted rain fell in Marlin on the 21st day of May, 1884, and as a consequence but few people were to be seen on the streets. The witness, who was alone in charge of the saloon on that day, found it necessary at one time to answer a call of nature. To do this he filled a spade with dirt, .nd went to an old unoccupied house that stood in the back yard. The front door of this house, some thirty or forty feet distant, and directly opposite the back door of the saloon, usually stood open. While easing himself in this old house, witness could see all over his saloon. This house was in the witness's back yard inclosure, and was used by the witness as a plunder ware room. While it was not free to the public, it was much frequented by persons other than those employed about the saloon, and doubtless persons went in and out of it during the day and night mentioned. Mr. Cloy's picture gallery, a temporary structure

of ordinary canvass, stood on the street near the witness's saloon, and some seventy or eighty feet in front of the outhouse spoken of. The fence inclosing the outhouse ran between it and the picture gallery, to its junction with the saloon buildings.

When the witness went to perform his operation in the out-house, he took his watch, to which an ordinary buckskin guard was attached, from his pocket, and laid it on a box that stood near. When he finished, he went back into his saloon. Within thirty minutes, Bill Moore, the witness's porter, asked the witness the time of day by which to regulate the clock. The witness then discovered that his watch was missing, and remembered instantly that he had left it in the outhouse. He sent Bill Moore to get it. Moore returned after a time, saying that he could not find it. Witness sent Moore back again, directing him to make a thorough search. Moore again returned, saying that it could not be found. At this time the witness was informed that the defendant ate his breakfast in the outhouse on that morning, and his suspicions became aroused, whereupon he told the boys to keep a watch upon defendant and not allow him to leave the place. Witness also told Mr. Cloy of the loss of the watch, and that he suspected the defendant. Witness then called his son, Tom Nicholson, and told him that he, the witness, was satisfied that the defendant had the watch, and he directed Tom and Bill Moore to take the defendant behind the house and tell him that he, the witness, knew that he, defendant, had the watch, and had said that if he did not go and get it, he, witness, would kill defendant. Witness knew that Tom and Moore took defendant off behind the house, but he did not know what they said to him. The defendant passed through the saloon once while the loss of the watch was being discussed, but the witness could not say that he heard what was said.

Some fifteen minutes after Tom and Bill Moore had the talk with the defendant about the watch, the defendant came into the saloon from the direction of Cloy's art gallery, and handed the witness his watch, with the statement as follows: "I found it (the watch) in the outhouse on a box, but I did not know it belonged to you. If I had known it was yours, I would have brought it to you, but I thought it belonged to some boy about town, who left it there last night after banging some coon, and I intended to have some fun." Witness, who was mad, told defendant that he wanted no explanation, and that he would give defendant just fifteen minutes to get out of town; that if he did not leave in that time, he, witness, would kill him. Within an hour, and after reflecting that it was

wrong to permit the defendant to thus escape the consequences of his crime, and perhaps enable him to depredate upon some other community, the witness sent his porter, Bill Moore, after him. Moore brought him back and witness filed a complaint charging him with the theft of the watch. Witness once exhibited the watch to the defendant, and knew that defendant knew the watch, and knew that it belonged to the witness. When the watch was brought back, the buckskin guard was perfectly wet. Witness prized this watch very highly, as it was once the property of a valued friend, now deceased. It was a fine gold watch, worth at least $100. It was taken from the witness's possession, without his consent, in Falls county, Texas, on the morning of May 21, 1884.

Bill Moore testified, for the State, that he was working as porter at Captain Nicholson's saloon, on the 21st day of May, 1884. He knew the defendant, who at that time had been about the saloon for several days. Meals were taken to the defendant at the saloon by the witness and others, by direction of Captain Nicholson. On the day mentioned, the witness, who was attempting to regulate the clock in the saloon, asked Captain Nicholson the time by his watch. Thereupon Captain Nicholson missed his watch and sent witness to the outhouse to get it from a box, where he said he left it that morning. Witness went to the outhouse, but failed, after careful search, to find it. Captain Nicholson sent him back to look again,—this time in company with Tom Nicholson. This search, like the first, was without result. Captain Nicholson then told witness and Tom to tell the defendant that he, defendant, knew where the watch was, and that if he did not produce it, he, Nicholson, would kill him. Witness and Tom went to the defendant as directed, but did not threaten him. They asked him kindly to surrender the watch. The defendant denied all knowledge of the watch. Witness then told the defendant that if he had the watch and would surrender it, he would not be molested because of the theft. He again denied that he had, or knew anything of it, and demanded to be searched. Tom Nicholson declined to search him, saying that he had been seen going into Cloy's art gallery, and that he would search the gallery. Tom then went to the gallery, leaving the defendant with the witness. Defendant remained with the witness until about the time that Tom reached the gallery, when he, too, left the witness and went to the gallery. A short time later the witness learned that Captain Nicholson had recovered his watch.

This witness described the outhouse exactly as the witness Nicholson did. Captain Nicholson ordered the defendant to leave town,

which the defendant did. Some time later, at the instance of Captain Nicholson, the witness followed the defendant and brought him back. Witness then had no warrant for the arrest of the defendant. Complaint was subsequently made, charging the defendant with the theft of the watch, and he was lodged in jail. No threats were used to the defendant in the hearing of the witness.

G. B. Cloy testified, for the State, that in May, 1884, he occupied a photographic gallery near Captain Nicholson's saloon, in Marlin, Texas. Witness knew the defendant, who at that time was staying about Nicholson's saloon. He had the defendant in his employ for a day or two. Witness's gallery was made of canvas. It had a dark room of the same material attached, and this dark room had a drop curtain. Witness saw the defendant, on the morning of the alleged theft, before Captain Nicholson told him of the loss of the watch. He saw the defendant at the time mentioned enter the art. gallery and go into the dark room. While the defendant was in the dark room, the witness heard something on the shelf move. He did not know what that thing was. Shortly after defendant left, Tom Nicholson came into the gallery to search it for the watch. Witness and Tom searched the dark room, but did not find the watch. Tom then left, but returned again shortly and went up to the curtain or entrance to the dark room. While he was standing there the defendant came into the dark room, touched Tom on the shoulder, and the two went out together. Witness did not know what passed between Tom and the defendant at that time. After the parties left the gallery the witness went into the saloon, saw the defendant, and heard Captain Nicholson abusing him. If the defendant got the watch from the dark room, the witness did not see him do it. A heavy rain had wet pretty much everything in the gallery. At this point the State closed.

Tom Nicholson testified, for the defense, that he lived in Marlin, Texas, and worked generally about his father's saloon. He knew that his father missed the watch involved in this prosecution, and he, witness, suspected the defendant had stolen it. On that morning he saw the defendant take some milk and bread from the witness Bill Moore, and take it into the outhouse and eat it. Witness did not, at first, permit the defendant to know that he, witness, suspected him of the theft. After having, with Bill Moore, made a careful search of the outhouse, which resulted in failure to find the watch, witness and Bill Moore took the defendant to a point behind the saloon and asked if he had the watch. Defendant denied all knowledge of the watch, declared that he had never seen it, and

demanded that the witness should search him. Witness then, speaking sharply, told the defendant that he must be a fool to suppose that he, witness, would search him, when he, witness, knew quite well that he, defendant, had been seen to go into Cloy's dark room on that morning. Witness then told Bill Moore to keep the defendant, while he went to search the gallery. Witness then went to the gallery, leaving the defendant with Bill Moore. Witness did not go into the dark room, but saw Cloy searching it with a lamp. About the time that witness got to the entrance of the dark room, the defendant came in and touched the witness and said to him: "Tommy, I have got your father's watch; I did not know that it belonged to him, or I would have taken it to him before. I thought it belonged to some fellow who had been after a coon in the old outhouse, and I intended to have some fun out of it." Defendant did not then show witness the watch. Witness went into the saloon and passed on to the back part of the room, from where he saw the defendant enter the saloon and hand the watch to witness's father. Defendant tried to repeat the same explanation to the witness's father, but the old man cursed him and would not listen. Not more than three quarters of an hour elapsed between the missing and the recovery of the watch. The watch was returned before any complaint was filed. Witness did not threaten the defendant with violence or prosecution.

The motion for new trial asserted that the verdict was against the charge of the court, the law, and the evidence.

No brief for the appellant has reached the Reporters.

*J. H. Burts*, Assistant Attorney General, for the State.

Hurt, Judge. This is a conviction for the theft of a watch, the property of W. A. J. Nicholson; two years' confinement in the penitentiary being the punishment assessed by the jury.

There is but one question for our decision presented in the record, which is, does the evidence show a voluntary return of the watch within a reasonable time, and before any prosecution was commenced? We are of the opinion that it does, and, consequently, the verdict is against the evidence and the charge of the court relating to this matter of return. (2 Bouvier's Law Dictionary, 635, word "Voluntary;" 1 Bouvier's Law Dictionary, 232, word "Constraint;" *Allen* v. *The State*, 12 Texas Ct. App., 190.) (The reporter will insert the evidence.)

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

[Opinion delivered November 15, 1884.]